## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

EDELMAN FINANCIAL ENGINES,
LLC, et al.,

       Plaintiffs,

       v.

MARINER WEALTH ADVISORS LLC,

       Defendant.

Case No. 2:23-cv-02515-HLT-BGS

## ORDER

Plaintiff Edelman Financial Engines and Defendant Mariner Wealth Advisors are competitors in the financial-planning industry. Mariner began hiring away Edelman's financial planners. Mariner was aware of those planner's confidentiality obligations to Edelman. Mariner nonetheless assisted the planners in reproducing lists of client information. Edelman contends this client information is a trade secret and that Mariner acquired or used this information to solicit Edelman's clients. Edelman now sues Mariner for various claims.

Mariner moves to dismiss the misappropriation, conspiracy, and defamation claims because Edelman has failed to state plausible claims. Doc. 19. The Court denies the motion in part and grants it in part. Although a close call, the Court denies the motion on the misappropriation claim because Edelman has plausibly stated that claim. The Court denies the motion on the conspiracy claim because Mariner has not demonstrated dismissal is appropriate. But the Court grants the motion on the defamation claim because Edelman does not identify any person who made an allegedly defamatory statement or when such statement was made.

## I.    BACKGROUND[1]

Financial planning is a highly competitive industry. Doc. 1 at ¶ 13. The ability to attract and retain clients is important to a company's competitive advantage. *Id.* Edelman provides financial planning services. *Id.* ¶ 2. Its business model is unique in that it handles lead generation for its financial planners. *Id.* By handling lead generation and finding clients for its planners, it allows them to focus on financial planning and allows services to be provided to a wider spectrum of people. *Id.* ¶¶ 15-16.

Edelman generates leads through extensive marketing efforts, including podcasts, webinars, publications, and newsletters. *Id.* ¶ 17. The "client leads, information, referral sources, and financial analyses that result from these marketing efforts are confidential information belonging to Edelman." *Id.* From these marketing efforts, "Edelman extrapolates a list of viable potential clients." *Id.* "The resulting list of clients and their ability to invest is among Edelman's most valuable trade secrets and gives it a competitive advantage in the industry." *Id.*

Client lists and client information is valuable and sensitive. *Id.* ¶ 23. Edelman protects this information with multi-layer authentication, password protection, encryption, and other security measures. *Id.* Use by competitors of client lists would undermine Edelman's competitive advantage. *Id.* ¶ 21. Client leads are assigned to a planner, who then develops the client relationship. *Id.* ¶ 18. Planners are required to sign employment agreements requiring them to maintain the confidentiality of trade secrets and other proprietary information. *Id.* ¶ 24.

Mariner is a direct competitor of Edelman. *Id.* ¶ 3. The bulk of the allegations in the complaint pertain to Mariner's "campaign to hire away high-performing Edelman Planners and

---

[1]    The Court accepts as true the well-pleaded facts in the operative complaint and draws reasonable inferences in Edelman's favor.

incentivize them to disclose the proprietary client information Edelman has spent decades curating." *Id.* ¶ 27. Mariner has knowingly procured breaches of Edelman's employment agreements, which include confidentiality clauses and prohibit solicitation and business with Edelman clients. *Id.* Mariner has caused the departure of at least 851 Edelman clients. *Id.* ¶ 3. At least ten former Edelman financial planners have left Edelman to go work for Mariner. *Id.* ¶ 4. Mariner has used pressure tactics and has suggested to potential employees that Edelman's business is failing, that it is a "sinking ship," and that "everyone is leaving." *Id.*

The planners identified in the complaint all left Edelman between 2021 and 2023. *Id.* ¶¶ 28, 48, 66, 90, 120, 142, 170, 188. For each of the Edelman planners hired by Mariner, Edelman alleges the following:[2]

- During their employment, Edelman paid the planners to develop goodwill on behalf of Edelman, and Edelman provided client referrals based on its extensive marketing efforts and allowed the planner to utilize Edelman's proprietary market analyses and investment strategies. *Id.* ¶¶ 29, 49, 67, 91, 121, 143, 171, 189.

- Edelman entered restrictive covenants with the planners, which include non-solicitation agreements and that prohibit disclosure of confidential information such as client or potential client lists and personal information. *Id.* ¶¶ 32, 52, 69-75, 93-94, 98, 104, 123-124, 128, 131, 145-146, 152, 154, 174, 191-194.

- The covenants also include agreements not to initiate contact with, engage in business of a similar nature with, or disclose the names of any client or potential client that the planner worked with while employed by Edelman. *Id.* ¶¶ 33, 53, 69-75, 95, 99, 105, 125-126, 147, 153, 175, 195. Some of the covenants also prohibit the planner from assisting others in doing these acts. *Id.* ¶¶ 33, 53, 74, 95, 175. These requirements generally extend for at least 15 months after leaving Edelman. *Id.* ¶¶ 34, 53, 76, 96, 99, 107, 148, 155, 175. Some include a duty of loyalty to Edelman while employed by Edelman. *Id.* ¶ 36.

- Mariner recruited the planners to leave Edelman and move their Edelman clients to Mariner. *Id.* ¶¶ 37, 55, 77 , 108, 129, 156, 177, 196.

---

[2]   The complaint discusses the departure of eight different planners. Many of the allegations are similar if not identical for all eight. But there are some differences in their restrictive covenants, as well as some additional planner-specific allegations discussed below. Those differences are generally not relevant to this order.

- Upon information and belief, Mariner asked for copies of the employment agreements and provided advice to the planners on how to position themselves to best defend a lawsuit by Edelman for breach of the agreements. *Id.* ¶¶ 37, 55, 77, 108, 129, 156, 177, 196.

- Upon information and belief, Mariner asked about the Edelman clients each planner was servicing, including their assets under management. Mariner used this information to develop compensation packages based on the assumption the planners would solicit their Edelman clients to move their business to Mariner. *Id.* ¶¶ 38, 56, 78, 109, 130, 157, 178, 197.

- Mariner required the recruited planners to sign non-solicitation and confidentiality agreements that were at least as restrictive as the ones provided by Edelman. *Id.* ¶¶ 39, 57, 79, 110, 132, 158, 179, 198.

- Upon information and belief, Mariner and the recruited planners conspired to convey Edelman's trade secrets to Mariner. *Id.* ¶¶ 41, 59, 81, 112, 133, 160, 181, 200.

- With Mariner's "assistance," the recruited planners "recreated a list of Edelman clients" and conveyed this information to Mariner, which was a breach of the restrictive covenants. *Id.* ¶¶ 42, 60, 82, 113, 136, 161, 182, 201. Mariner unlawfully accepted and used this information knowing it was a violation of the restrictive covenants. Mariner actively encouraged breach of the restrictive covenants by tying compensation to performance milestones, based on the assumption the recruited planners would bring in their Edelman clients. *Id.* ¶¶ 43, 61, 83, 114, 137, 162, 183, 202.

- With Mariner's knowledge and "assistance," the recruited planners initiated contact with their Edelman clients in breach of the restrictive covenants and solicited their business. *Id.* ¶¶ 44, 62, 84, 115, 138, 163, 184, 203.

The complaint includes some allegations specific to particular planners. Joseph Azzopardi contacted Edelman clients within six days of ending his employment with Edelman. *Id.* ¶ 63. Kevin Garvey admitted to initiating contact with and soliciting Edelman clients after his resignation. *Id.* ¶¶ 85-86. Brian McGuire contacted 111 Edelman clients and accepted business from at least 55 of them, and he encouraged them to move to Mariner by offering lower fees. *Id.* ¶ 116. John Geilfus had a Mariner document on his computer titled "Due Diligence Questionnaire for Lift Out," with "lift out" conveying Mariner's desire to "lift out" Edelman's

clients. *Id.* ¶ 134. Edelman was notified that Seth Kelly contacted Edelman clients within a week of his resignation and enticed them to leave Edelman by offering lower fees. *Id.* ¶¶ 164-165.[3]

Mariner has continued to approach and recruit Edelman employees. *Id.* ¶ 205. Mariner has also used pressure tactics and published defamatory statements about Edelman. *Id.* ¶ 206. "Mariner agents" have said to at least one Edelman employee that "Edelman is a sinking ship," meaning Edelman's business is failing. *Id.* ¶ 207. This statement was false when made because Edelman has over $245 billion in assets under management. *Id.* "Mariner agents" have also falsely stated that "everyone is jumping overboard" at Edelman and have asked rhetorically, "do you really want to be the last planner standing at that firm." *Id.* ¶ 208. These statements carry a connotation that Edelman's business is failing. *Id.* Another "Mariner agent" has stated: "We're running EFE out of business," which implies that Edelman is in imminent danger of closing. *Id.* ¶ 209.

Edelman brings several claims against Mariner. Count 1 is for violation of the Defend Trade Secrets Act, 18 U.S.C. § 1839. *Id.* ¶¶ 211-221. Count II is for violation of the Kansas Uniform Trade Secrets Act. *Id.* ¶¶ 222-232. Count III alleges conspiracy to misappropriate trade secrets. *Id.* ¶¶ 233-242. Count IV is for tortious inference with contract as to the restrictive covenants for the planners who left Edelman. *Id.* ¶¶ 243-252. Count V is for tortious interference with business relations and expectations. *Id.* ¶¶ 253-259. Count VI is for unfair competition. *Id.* ¶¶ 260-268. And Count VII is for defamation. *Id.* ¶¶ 269-274. Mariner moves to dismiss the claims for misappropriation, conspiracy, and defamation. Doc. 19.

## II.    STANDARD

A complaint survives a Rule 12(b)(6) motion to dismiss when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*,

---

[3]    Edelman has apparently been involved in separate litigation with the planners. But they are not parties to this case.

556 U.S. 662, 678 (2009) (internal quotation and citation omitted). A claim is plausible if there is

sufficient factual content to allow a court "to draw the reasonable inference that the defendant is

liable for the misconduct alleged." *Id.* Plausibility requires "more than a sheer possibility that a

defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* "Where a

complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the

line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation and citation

omitted). A court must accept as true all well-pleaded allegations in the complaint, but it does not

accept legal conclusions or conclusory statements. *Id.* at 678-79.

## III.    ANALYSIS

### A.    Misappropriation Claims

Mariner moves to dismiss the misappropriation claims on grounds that Edelman has failed

to plead sufficient facts that Mariner misappropriated trade secrets. Doc. 20 at 5-9. Federal law

authorizes a civil action for the misappropriation of trade secrets. 18 U.S.C. § 1836(b). A plaintiff

establishes a DTSA claim by showing "(1) the existence of a trade secret; (2) the acquisition, use,

or disclosure of the trade secret without consent; and (3) that the individual acquiring, using, or

disclosing the trade secret knew or should have known the trade secret was acquired by improper

means." *API Americas Inc. v. Miller*, 380 F. Supp. 3d 1141, 1147-48 (D. Kan. 2019).[4]

Mariner does not challenge the existence of trade secrets. Mariner instead makes two

related arguments, namely that (1) Edelman has not alleged improper acquisition of any trade

secrets by the <u>planners</u>, and (2) allegations of misappropriation are generalized and conclusory.

---

[4]   The same elements apply to a claim under the Kansas Uniform Trade Secrets Act. *API Americas Inc.*, 380 F. Supp. 3d at 1147-48.

The Court considers these arguments together because they both go to whether Edelman has plausibly alleged misappropriation.

Section 1839(5)(A) defines "misappropriation," in part, as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A).[5] The focus of this analysis is not whether the planners acquired trade secrets improperly. The focus is on whether <u>Mariner</u> improperly acquired trade secrets. *See Allergan, Inc. v. Revance Therapeutics, Inc.*, 2024 WL 38289, at *7 (M.D. Tenn. 2024) ("[I]f a plaintiff shows that a defendant merely acquired (without also using or disclosing) the plaintiff's trade secret(s), then indeed the plaintiff must show that <u>the defendant</u> did so by 'improper means.'" (emphasis added)).

The term "improper means" as defined in the statute "includes theft, bribery, misrepresentation, breach or <u>inducement of a breach of a duty to maintain secrecy</u>, or espionage through electronic or other means." *Id.* § 1839(6)(A) (emphasis added). This means that Mariner acquired trade secrets through improper means if it induced a breach of a duty of secrecy. *See Nat'l City Bank, N.A. v. Prime Lending, Inc.*, 737 F. Supp. 2d 1257, 1267 (E.D. Wash. 2010) ("Nevertheless, Prime used improper means to acquire the information: it induced National City's outgoing employees to breach their agreements to maintain confidentiality.").

Here, Edelman's claim is not limited to simply hiring former employees imbued with trade secrets. Edelman instead alleges that Mariner acquired Edelman's trade secrets by hiring Edelman's planners, discussing the trade secrets at issue with them, using that information to develop compensation packages, assisting and enabling them to recreate that information in

---

[5]  Other definitions of "misappropriation" in this case might apply, but it is unclear what definition Edelman relies on for purposes of its claim. Mariner only discusses § 1839(5)(A), misappropriation through acquisition, and the Court therefore limits its analysis to that definition.

knowing violation of confidentiality agreements,[6] and then allowing them to use that recreated information to solicit Edelman's clients. This claim alleges acquisition through improper means by Mariner because Mariner allegedly induced and assisted the planners to breach their confidentiality agreements by recreating the client lists and then by allowing them to use that recreated information to solicit clients. Because acquisition through improper means is considered misappropriation, the Court finds Edelman has stated a claim for misappropriation of trade secrets.

These allegations are admittedly <u>thin</u>. But they are distinct enough from the allegations in *Biomin America, Inc. v. Lesaffre Yeast Corp.* to warrant a different outcome. There, acquisition of a trade secret was not at issue—only use or disclosure. *Biomin Am., Inc. v. Lesaffre Yeast Corp.*, 2020 WL 2395200, at *3 n.4 (D. Kan. 2020). The plaintiff had only made conclusory allegations that its former employees used trade secrets. *Id.* at *4-5. The claim against the defendant-employer (the new employer of the plaintiff's former employees) also failed because the plaintiff relied on "threadbare legal conclusions" and only alleged that the new employer acted "in concert with" the former employees. *Id.* at *6. There were no allegations that anyone at the defendant-employer knew or should have known about any alleged misappropriation by the individuals. *Id.*[7]

Here, by contrast, Edelman has alleged Mariner knew about the alleged trade secrets, asked about them when hiring the planners, and then "assist[ed]" the planners in recreating a list of customers. Although *Biomin* correctly noted that improper use or disclosure of trade secrets by an employee is not "reflexively impute[d]" to a new employer, *id.* at *6, Edelman's allegations here are something slightly different. It's not the actions of the planners that Edelman challenges, nor

---

[6]   The complaint alleges Mariner was aware of the confidentiality agreements. Doc. 1 at ¶¶ 37, 55, 77, 108, 129, 156, 177, 196.

[7]   The claim against the defendant-employer alternatively failed because there were no plausible allegations of misappropriation by the defendant-employees. *Biomin*, 2020 WL 2395200, at 6 n.8. The defendant-employer could not have "acted in concert with" any such misappropriation because no misappropriation had been plausibly alleged. *See id.*

do they seek to hold Mariner liable simply for hiring the planners. *See Ciena Commc'ns, Inc. v. Nachazel*, 2010 WL 3489915, at *4 (D. Colo. 2010) ("Indeed, such an absolute rule—essentially imposing strict liability on a corporation that hires a person possessing others' trade secrets—is contrary to the very language of the Uniform Trade Secrets Act."). Rather, Edelman alleges Mariner acquired Edelman's trade secrets by assisting or inducing the planners to disclose trade secrets that Mariner knew the planners were obligated not to disclose. These factual allegations are thin, but they are sufficient to allege misappropriation through acquisition at this stage. Mariner's motion on this point is denied.[8]

### B.      Conspiracy

Mariner next argues the Court must dismiss Edelman's conspiracy claim because it is based on a claim of misappropriation instead of on an actionable tort as required by Kansas law. Doc. 20 at 10. Edelman responds that a conspiracy claim only need be based on a wrong separate from the conspiracy and that a statutory misappropriation claim suffices. Doc. 22 at 16.

Neither side has offered much analysis on this point. None of the limited authorities cited specifically addresses the question of whether a conspiracy claim in Kansas can be based on a statutory trade-secret misappropriation claim. Based on the slim arguments presented in the motion to dismiss, the Court denies the motion on this point without prejudice.

### C.      Defamation

Finally, Mariner argues Edelman has failed to state a claim for defamation. Doc. 20 at 11-16. Defamation claims are governed by Rule 8. *Heckman v. Zurich Holding Co. of Am.*, 2007 WL 677607, at *5 (D. Kan. 2007). "To sufficiently plead [a] defamation claim, plaintiff must set forth

---

[8]    Because the Court denies the motion on this point, it also denies the argument that the Court should decline supplemental jurisdiction.

in [the] complaint the allegedly defamatory words, the communicator of those words, the persons to whom those words were published and the time and place of publication." *Id.*[9]

Mariner argues Edelman fails to meet this standard because Edelman only alleges that unknown "agents" or "employees" of Mariner made the allegedly defamatory statements. Doc. 20 at 11. Mariner argues that Edelman does not identify who made the statements, when the statements were made, to whom the statements were made, or how the statements were published. *Id.*

The Court agrees Edelman has not met the pleading standard for defamation. The complaint does not identify any person who made an allegedly defamatory statement. It only states that "Mariner agents" have said certain things. Doc. 1 at ¶¶ 207-209, 272-273.[10] This fails to meet the requisite pleading standard for defamation. *See Heckman*, 2007 WL 677607, at *6 ("Specifically, the generic statements that 'top-level/supervisory executives' and LeBoeuf attorneys communicated with 'other top-level/supervisory executives' and 'various insurance regulators for various states and others in the insurance industry' do not provide adequate details of the defamation claim to enable defendants to defend the allegation.").[11]

Nor are there are there allegations about when the allegedly defamatory statements were made. The listener of these statements are generally not identified, except in one instance where the statement was made to an "Edelman employee," and a generic allegation "upon information

---

[9]   Mariner argues that other state law may apply to this analysis. Edelman argues any other law is immaterial because the pleading standards are the same regardless of the applicable law. Doc. 22 at 17 n.2. The Court therefore cites Kansas law.

[10]  One paragraph in the complaint only states that "Mariner" made a statement. Doc. 1 at ¶ 271.

[11]  These general allegations in *Heckman* did not suffice, but there were other more specific allegations that did survive, including one that identified a date and speaker. *Heckman*, 2007 WL 677607, at *6 ("These allegations sufficiently identify the defamatory words (statements that plaintiff failed to report compliance violations and requested suspension of audits), the communicator of those words (Bradley), the person to whom those words were published (Alford) and the time and place of publication (plaintiff's termination meeting on February 27, 2006)."). There are no analogous allegations in this case.

and belief" that Mariner made statements "to third parties, including Edelman clients." *Id.* ¶¶ 207, 274. This fails to put Mariner on notice under Rule 8. *See Garcia v. Tyson Foods, Inc.*, 890 F. Supp. 2d 1266, 1270 (D. Kan. 2012) ("A claim of defamation complies with pleading requirements when it supplies sufficient notice of the communications complained of to allow [the defendant] to defend itself." (internal quotation and citation omitted)).

Edelman's reliance on *Snyder Insurance Services, Inc. v. Sohn* is not persuasive. In *Snyder*, the court did hold that "Rule 8 does not require detailed factual allegations." *Snyder Ins. Servs., Inc. v. Sohn*, 2017 WL 2839775, at *3 (D. Kan. 2017) (internal quotation and citation omitted). However, the court in *Snyder* found the claim sufficient because it was based on a formal complaint made in February 2016 to a state insurance commissioner and a statement to a named third party made in April 2016 by an individual defendant. *Id.* at *1-3. The plaintiff had therefore alleged who made the defamatory statements, when, and to whom. Here, by contrast, the allegedly defamatory statements are only alleged to have been made by unknown "agents" to unknown employees or third parties at some unknown times. Edelman's defamation claim is dismissed.[12]

## IV.   CONCLUSION

THE COURT THEREFORE ORDERS that Mariner's Motion to Dismiss (Doc. 19) is GRANTED IN PART AND DENIED IN PART. The motion is denied as to the misappropriation and conspiracy claims and granted as to the defamation claim. The defamation claim is dismissed without prejudice.

---

[12] Edelman states that it "has sufficient information to file an amended complaint identifying the person who made the defamatory statements, the person to whom they were published, and the time and place of the defamatory statements." Doc. 22 at 18 n.3. The Court does not construe this as a request to amend, nor would it be proper to make such a request in a response brief. *See Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty., Colo.*, 771 F.3d 697, 706 (10th Cir. 2014) (noting that a court generally does not need to grant leave to amend where a party fails to file a formal motion); *see also* D. Kan. Rule 15.1(a). Nor does the Court determine whether including this information would satisfy the pleading standard for defamation in this case, as the Court declines to reach Mariner's additional arguments regarding this claim.

IT IS SO ORDERED.

Dated: June 24, 2024                  /s/ *Holly L. Teeter*
                                            HOLLY L. TEETER
                                            UNITED STATES DISTRICT JUDGE