## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

EDELMAN FINANCIAL ENGINES,
LLC, et al.,

        **Plaintiffs,**

        **v.**

MARINER WEALTH ADVISORS LLC,

        **Defendant.**

        **Case No. 2:23-cv-02515-HLT**

## <u>MEMORANDUM AND ORDER</u>

This is a high-dollar dispute between two wealth advisory firms. Defendant Mariner Wealth Advisors ("Mariner") hired away some financial planners from Plaintiffs Edelman Financial Engines, LLC and Edelman Financial Engines, L.P. (collectively "Edelman"). Many of the newly hired planners ("Departed Planners") listed some Edelman clients from memory upon starting their job with Mariner. They then researched publicly available information to contact their former clients and reached out to them. Edelman contends that its client information is a trade secret, that Mariner incentivized the Departed Planners to solicit its clients and benefited from their actions, and that Mariner thereby misappropriated Edelman's trade secrets. Edelman sues Mariner and asserts a Defend Trade Secrets Act ("DTSA") claim (the sole jurisdictional hook) and various state-law claims. Mariner moves for summary judgment. Doc. 122. Edelman moves for partial summary judgment on liability. Docs. 119 and 120.

The briefing is extensive. But the Court begins and ends with one question: Has Edelman presented evidence from which a reasonable jury could find that Mariner misappropriated its trade secrets? The answer is no. Many aspects of the financial planning industry are confidential. And the identity of and information about a wealth advisory firm's clients inherently has some value.

But confidential information with some value does not automatically equate to a trade secret. Edelman fails to show that (1) its identified trade secrets are actual trade secrets; and (2) Mariner misappropriated them. No reasonable jury could find for Edelman on its DTSA claim. The Court grants Mariner's motion for summary judgment and denies Edelman's. The Court declines supplemental jurisdiction and does not reach <u>any</u> of the state-law claims. The pending *Daubert* motions (Docs. 113, 114, and 115) are denied without prejudice as moot.

## I.    BACKGROUND

### A.    Predicate Factual Issues.

The Court starts with a predicate issue that is ancillary to the substance of the case but that has complicated the Court's review and frustrated resolution of the pending motions. Edelman uses some briefing tactics that are not in line with the Federal Rules of Civil Procedure or this district's local rules. The Court notes two. First, Edelman at times fails to properly controvert Mariner's facts or to support its own with pinpoint citations to the record. Second, Edelman at other times misrepresents the evidence and even tries to modify it to fit Edelman's narrative. Neither problem is a one-off; they appear throughout Edelman's briefing, to the point that the Court cannot excuse them. The Court addresses briefly each issue.

#### 1.    Failure to Properly Controvert or Support with Citation.

This district's local rules require parties to "refer with particularity to those portions of the record" in setting forth disputed or undisputed facts. D. Kan. R. 56.1. Conclusory allegations, allegations unsupported by specific facts, and speculation are insufficient to create a genuine issue of material fact. *See Colony Nat'l Ins. Co. v. Omer*, 2008 WL 2309005, at *1 (D. Kan. 2008).

Edelman sometimes refers only to the entirety of an exhibit to support a statement. There are instances where such approach may be appropriate (e.g., citing the entirety of a contract to

support its existence), but the shortcomings in this case are different. *See, e.g.*, Doc. 135 at ¶ 29 (citing exhibits 144-153 in their entirety, which span nearly one hundred pages in total); ¶ 33 (same); ¶ 30 (citing exhibits 99-114 in their entirety, which span more than fifty pages in total). Many of the exhibits are lengthy. And for some facts, Edelman cites no portion of the record whatsoever. *See, e.g.*, *id.* ¶¶ 19, 36. Or it merely states without citation that a fact is disputed to the extent it suggests something unfavorable to Edelman. *See, e.g.*, *id.* ¶¶ 40, 42, 53, 54, 59, 60, 61, 64-67. It is not the Court's role to scour the record for evidence to support Edelman's position. *See Freebird Commc'ns, Inc. Profit Sharing Plan v. Roberts*, 2019 WL 5964583, at *1 (D. Kan. 2019) (citing examples).

The record is voluminous. For Edelman's own summary-judgment motion alone, Edelman submitted more than 700 pages of unsealed materials and more than 1,700 pages of sealed materials. Edelman did not file the exhibits individually as contemplated by this district's administrative guidelines section IV.B. Instead, Edelman filed them in packets of documents ranging from three hundred pages to more than one thousand pages per file. This, too, complicated review. The Court nevertheless has reviewed the record. But where Edelman fails to provide a pinpoint citation, the Court did not undertake a detailed review to determine whether the exhibit supports Edelman's position.

### 2.    Misrepresentation and Attempted Modification.

The Court found instances where Edelman purportedly summarized what a piece of evidence said. But when the Court reviewed the evidence in the record, the evidence did not say what Edelman represented. The following example is illustrative. Edelman states, "The record clearly indicates that Mariner directed the Departed Planners to create the re-constructed client lists." Doc. 135 at ¶ 43; *see also* Doc. 120 at ¶ 27. But the deposition transcript excerpts that

Edelman cites do <u>not</u> indicate that Mariner <u>directed</u> the Departed Planners to create the client lists. The Court reviewed every citation referenced by Edelman in its response to Mariner's paragraph 43 and did not find a single Departed Planner who testified that Mariner <u>directed</u> him "to create the re-constructed client lists." Edelman's misstatement of the record is frustrating and causes the Court to question all Edelman's representations that material facts are genuinely disputed. And, unfortunately, this is not the only time the Court discovered the same problem. The Court notes other instances as relevant throughout this memorandum and order.

The Court also notes what may be Edelman's most egregious misstep: the improper use of an errata sheet and corresponding declaration to substantively contradict deposition testimony given under oath while counsel was present. Edelman's corporate representative, Bryan Clark, testified about an entity that is not a party to this case, Financial Engines Advisors, LLC, or "FEA." Clark then "corrected" his testimony via an errata sheet and a declaration. In doing so, he made material changes to his deposition testimony. Mariner developed a chart, and the Court includes a few excerpts from the chart to illustrate the problems:

| Clark Deposition Testimony | Clark Declaration or Clark *Errata* |
|---|---|
| He is employed by FEA. **Mariner SJ Br. Ex. M, Edelman (Clark) Dep. Tr. 43:11-22, 43:22.** | "I am only employed by Edelman Financial Engines, LLC." **Clark Errata 42:17-18.**<br><br>"I have been employed at Edelman Financial Engines, LLC since 2016." **Clark Errata 43:22.** |
| Fees were paid by FEA to the Departed Planners. **Ex. M, Clark Dep. Tr, 112:10-15.** | "The Departed Planners were paid by Edelman Financial Engines, LLC." **Clark Errata, 112:15**.<br><br>"All of these planners are exclusively employed and compensated by EFE LLC." **Clark Decl. ¶ 2.** |

Doc. 145 at 4-5.

This is not the proper use of an errata sheet or declaration. The Court is justified in disregarding the content of both. *See Eucalyptus Real Est., LLC v. Innovative Work Comp Sols., LLC*, 676, F. Supp. 3d 938, 945-48 (D. Kan. 2023), *aff'd*, 2024 WL 1631228 (10th Cir. Apr. 16, 2024) (declining to consider errata's material changes to testimony). But, in the end, this improper tactic is immaterial because the Court does not reach the primary issues addressed via the errata sheet (i.e., which entity is the proper party to bring these claims).

### B.   Undisputed Facts.

The Court now turns to the undisputed facts. Both parties contend they are entitled to summary judgment on one or more issues. A court faced with dueling summary-judgment motions views each motion separately and construes the facts they present in the light most favorable to the non-moving party. *United States v. Sup. Ct. of N.M.*, 839 F.3d 888, 906-07 (10th Cir. 2016). With this standard in mind, the following facts are uncontroverted except where otherwise noted.[1]

### 1.   The Parties' Investment Advisory Businesses.

The parties and their affiliates are generally in the same business: they are wealth advisory firms that provide investment advisory and wealth management services. There are nuances in which entities register with the SEC, pay advisors, and enter into client contracts. But broadly speaking, the parties are business competitors who compete to attract productive and effective financial planners to build their business and assets under management ("AUM"). AUM is the total market value of the investments held by a portfolio manager or investment company on behalf of clients.

---

[1]   Both Edelman and Mariner, to one degree or another, incorporate facts or argument from its own summary-judgment motion into its response to the other's motion. This approach improperly circumvents page limits imposed by the Court and local rules. It is also inconsistent with Tenth Circuit instruction to view each motion separately. The Court therefore does not countenance these statements. The Court has done its best to review the facts presented by each motion, evaluate whether they are properly controverted, and present them in a consolidated form here.

Edelman touts its "lead generation program" as unique. Edelman generates client leads for its financial planners. This allows planners to focus on client service rather than marketing. Edelman submitted a purported five-year marketing budget to demonstrate how much it pays annually to develop its client list. The summary document appears to be a budget for the years 2020 through 2024. Bryan Clark testified that Edelman spends close to $40 million per year generating leads for its planners. Most clients that the Departed Planners served at Edelman were from Edelman-generated leads.

Mariner has its own lead generation program. Mariner routinely hires advisors based on a need to handle leads generated by that program. Mariner has grown its AUM substantially since 2019, mostly from acquisitions and affiliations with advisors who were previously employed by firms other than Edelman.

### 2.  The Departed Planners.

Edelman employed the following financial planners: Mike Horne, Joseph Azzopardi, Kevin Garvey, Brian McGuire, John Geilfuss, Seth Kelly, Jacob Mercer, Mike Borgatti, Ronald Newton, and Walter Varian. Each left Edelman to work for Mariner between 2021 and 2025. Each Departed Planner entered at least one written agreement with Edelman that included restrictive covenants. The covenants vary in form, but they prohibited solicitation of Edelman's clients for at least twelve months. Some also prohibited accepting Edelman's clients for the same duration. Nevertheless, Edelman's clients can terminate their relationships with Edelman or a planner at any time and for any reason.

### 3.  Mariner's Recruitment.

Some of the Departed Planners reached out to Mariner about potential employment. Mariner initiated communication with others. Mariner regularly communicates with advisors

associated with other firms who may be interested in joining Mariner. Mariner has considered recruiting from about 155 advisory firms (including Edelman) within the past five years.

Mariner does not require planners hired from other firms to bring or to attempt to bring clients whom they serviced at a prior firm. More specifically, Mariner did not require the Departed Planners to bring or to attempt to bring clients with them. Mariner did, however, incentivize Departed Planners to bring clients with them by entering a "Purchase Agreement" with them. Mariner bought the Departed Planners' goodwill with Edelman clients in exchange for a bonus of 1.5X to 2X the net revenue generated by those clients if they moved their business to Mariner during the first eighteen to twenty-four months of the Departed Planners' employment.[2] And Mariner requested and usually received a copy of the Departed Planners' agreement(s) with Edelman, which included restrictive covenants. The Departed Planners in fact agreed to inform a potential employer about their obligations under the agreements.

Mariner uses a document called "Due Diligence Questionnaire for Lift Outs" during the recruitment process. The questionnaire asks the candidate for the "fee schedule" used for clients. It also asks the candidate to describe any variances if the fee schedule varies. Mariner does try to learn generally about a candidate's field experience, including how much AUM the candidate has serviced. But Mariner does not ask for or receive client-specific information. Edelman's attempt to show otherwise is disingenuous and insufficient to create a genuine issue of material fact.

Edelman repeatedly cites three instances in which it insists that Departed Planners Garvey, Geilfuss, and Varian provided client-specific fee information to Mariner. But none of the

---

[2]    Edelman characterizes this as Mariner incentivizing the Departed Planners to breach their non-solicitation agreements. But the non-solicitation agreements range in length from twelve to fifteen months. So it was not automatic that the Departed Planners would have to solicit former clients during the prohibited period to earn a bonus. Many planners still had between three and twelve months after expiration of the non-solicitation period during which they could solicit former clients without risk of breaching their non-solicitation agreement.

documents cited connect a fee rate to a particular client or account. Garvey and Geilfuss gave Mariner their Planner Compensation Statement (the "BRAC report"). Garvey's BRAC report includes certain fee rates billed to clients. But it is not client-specific. Geilfuss's BRAC report, which is photographed from his computer, is cut off on the edge so it does not show the fee rate. And the spreadsheet Varian provided Mariner is not client-specific. The spreadsheet appears to show fees paid year-to-date, line-by-line. The fees are listed by "Reg Type," i.e., "Individual," "IRA Rollover," "Roth," and "Individual Retirement Account." The spreadsheet does not contain any identifying information to connect numbers or rates to clients. Suffice it to say, the exhibits found at Doc. 120-3 at 396-412 and Doc. 120-4 at 525-552 do not create a genuine issue of material fact over whether Mariner asked for or received client-specific information.

Some Departed Planners shared general information about Edelman's fee schedule during recruitment discussions. But Mariner did not use the information.[3] Mariner requested and received information about the Departed Planners' compensation with Edelman to determine offers of employment.[4] And Mariner requested and received information regarding the amount of AUM and

---

[3]    Edelman contends that this fact is disputed. Edelman maintains that "Mariner used this information to compete with Edelman and ensure that its fee schedule was as good as or better than the Edelman fee structure so that Edelman clients would move their assets to Mariner." Doc. 135 at ¶ 32. But Edelman's citation to the record for this point does not support this statement. Departed Planner Azzopardi testified that he gave a former Edelman 401(k) client a fee schedule that was lower than Mariner typically charged for 401(k) clients. Azzopardi was able to get Mariner's approval for the fee schedule and keep the client's fee the same. He also testified in the next sentence (not cited by Edelman) that he did not explain to Mariner why he wanted the fee applied to the client. Doc. 120-2 at 25.

[4]    Edelman contends that this fact is disputed. Edelman maintains that "Mariner also used the information to determine whether the 'litigation costs' it would face from executing its unlawful scheme were outweighed by the financial upside of obtaining the Departed Planners' Edelman clients and their AUM." Doc. 135 at ¶ 33. Again, Edelman's citation to the record does not support this statement. The evidence cited shows that Mariner established a "litigation risk rating" for prospective new hires. It also shows that Mariner asked about threatened and ongoing litigation, as well as Edelman's past reaction to individuals leaving its employ. But the evidence does not make the bridge Edelman says it does—i.e., that Mariner used compensation information to conduct a litigation cost-benefit assessment.

number of clients serviced "for Mariner to gain a better understanding of their industry experience, which information Mariner did not use for any other purpose."[5] Doc. 123 at 19.

### 4.    Resignation from Edelman and Onboarding with Mariner.

The Departed Planners did not take any of Edelman's documents or ESI upon resigning. Neither have they used any of Edelman's documents or ESI in their employment with Mariner. All the Departed Planners but Borgatti did, however, type the names of clients they could recall from memory into a "Smartsheet" Excel document. They then used publicly available resources to find contact information for the clients. The Departed Planners other than Geilfuss (and Borgatti) used the Smartsheets to track their contact with clients to inform them of their new employment. But Mariner did not direct Departed Planners to record client names in a Smartsheet or require them to do so. Likewise, Mariner did not direct the Departed Planners to solicit or accept business of any prior client and did not condition employment on such a requirement.[6]

### 5.    Former Client Communication.

Mariner directed the Departed Planners other than Horne and Azzopardi not to solicit the former clients, but instead to (1) inform the client of their new employment and contact information, (2) respond factually to any questions, and (3) have no further contact if the client did not want further contact. Five former Edelman clients have signed affidavits indicating that their experience was generally consistent with this practice.

---

[5]    Edelman contends that the record "indicates that Mariner asked for this information to determine if the Departed Planner was worth the litigation risk." Doc. 135 at ¶ 35. Again, the evidence Edelman cites shows that Mariner assessed litigation risk in its hiring decisions. But it does not show that Mariner asked for information about AUM and the number of clients serviced to determine whether a Departed Planner was worth the litigation risk (and not only to gain a better understanding of the Departed Planner's industry experience).

[6]    Edelman contends Mariner did, in fact, require the Departed Planners to use the Smartsheets and solicit business from former clients because "Mariner methodically created a recruiting system that intentionally incentivized the Departed Planners to breach their restrictive covenants and bring, or attempt to bring, clients they serviced at Edelman to Mariner." Doc. 135 at ¶¶ 29, 39, & 43. As the Court previously noted, this statement is not an accurate representation of the evidence cited in support.

### 6. Alleged Trade Secrets.

Most of the Departed Planners developed a list of the names of some prior clients from memory. They then looked up contact information on those clients, sometimes using independent knowledge about the client to filter out incorrect matches. But the only way Mariner ultimately received client-specific information was from the clients themselves if they chose to move to Mariner. Mariner only obtained client-specific information about AUM, investment positions, and fees charged by Edelman from the clients themselves if they became Mariner clients.

## II.   STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Courts applying this standard view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation and citation omitted).

## III.   ANALYSIS

Federal law authorizes a civil action for the misappropriation of trade secrets. 18 U.S.C. § 1836(b). To establish a DTSA claim, a plaintiff must show "(1) the existence of a trade secret; (2) the acquisition, use, or disclosure of the trade secret without consent; and (3) that the individual acquiring, using, or disclosing the trade secret knew or should have known the trade secret was acquired by improper means." *API Americas Inc. v. Miller*, 380 F. Supp. 3d 1141,

1147-48 (D. Kan. 2019). The Court addresses below whether Edelman has sufficient evidence to create a jury question about the existence of a trade secret and about the misappropriation of any such trade secret. Edelman does not.[7]

## A.    Existence of Trade Secrets.

The first requirement for a misappropriation claim is the existence of a trade secret. Edelman has shifted positions on what its purported trade secrets are during the case. It appears that Edelman has now settled on two: (1) "the cumulative list of the names of nearly 1,000 confirmed Edelman clients with confirmed assets to invest and the Departed Planners' knowledge of those clients," and (2) "non-public information regarding specific Edelman fees and AUM of the clients serviced by the Departed Planners." Doc. 135 at 24, 26.[8] The DTSA defines "trade secret" to include:

> all forms and types of financial, business, scientific, technical, economic, or engineering information . . . [provided that] (1) the owner must have "taken reasonable measures to keep such information secret," and (2) the information must derive "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information[.]"

*Double Eagle Alloys, Inc. v. Hooper*, 134 F.4th 1078, 1087 (10th Cir. 2025) (quoting 18 U.S.C. § 1839(3)). The plaintiff bears the burden of identifying its trade secrets and showing they exist. *Id.* at 1088. The plaintiff must use sufficient particularity in describing its alleged trade

---

[7]   The parties spent much time debating whether FEA (not a party) is the owner and real party in interest to bring Edelman's claims. Mariner contends that FEA is a necessary and indispensable party and that FEA, not Edelman, owns the purported trade secrets at issue. This argument has some appeal and raises some interesting issues. But, in the end, it does not impact the outcome. The Court decides the case on other grounds.

[8]   Despite the way Edelman addresses the purported trade secrets in its response to Mariner's motion for summary judgment, Edelman states in its reply brief to its own motion that it has not abandoned any trade-secret theories. Doc. 142 at 2, n.1. But this is inconsistent with Edelman's treatment of its alleged trade secrets in response to Mariner's summary-judgment motion. Mariner moved for summary judgment on all Edelman's asserted trade secrets. Edelman narrowed its response to two and has thereby waived arguments as to any other trade secrets.

secrets to ensure that the defendant has "'concrete identification to prepare a rebuttal.'" *Id.* (quoting

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 658 (9th Cir. 2020)). Whether a trade

secret exists is generally a question of fact. *ATS Grp., LLC v. Legacy Tank & Indus. Servs. LLC*,

407 F. Supp. 3d 1186, 1198 (W.D. Okla. 2019) (citations omitted).

A customer list can meet the definition of a trade secret. *BioCore, Inc. v. Khosrowshahi*,

96 F. Supp. 2d 1221, 1235 (D. Kan. 2000), *rev'd on other grounds*, 80 F. App'x 619 (10th Cir.

2003). But a mere list of customer names, even including their addresses, may not always be a

trade secret. *Id.* The determination requires a "fact-intensive inquiry" into the contents of the list.

*Id.*[9] One consideration is whether the list contains detailed information such as "purchasing

patterns, sales volumes and payment histories." *Id.* The list can be written or memorized; there is

not a discernable difference in trade secret protection for tangible lists versus memorized lists. *See*

*Masimo Corp. v. True Wearables, Inc.*, 2022 WL 17083396, at *18 (C.D. Cal. 2022) ("Although

[Defendant] believes that whatever he could remember in his head from his time with Plaintiffs

became his . . . this belief is contrary to trade secret law."); *Tribal Behavioral Health LLC v.*

*Reeves*, 2022 WL 2290563, at *11 (D. Ariz. 2022) ("[T]rade secret protection does not depend on

whether the [customer] list misappropriated is in written form or memorized." (internal quotation

omitted)).

The Court first addresses how Edelman has defined its trade secrets. Then it turns to

Edelman's efforts to keep its information secret and the information's independent economic

value.

---

[9]    Summary judgment may still be proper under some circumstances even though trade secrecy is an issue of fact. *Snyder v. Beam Techs., Inc.*, 147 F.4th 1246, 1257 (10th Cir. 2025).

### 1.    Edelman's Identified Trade Secrets.

The Court begins with pinning down the two trade secrets Edelman claims Mariner misappropriated. As noted, Edelman has the burden to identify them.

### a.    Client Lists.

The first is Edelman's client list of "confirmed Edelman clients with confirmed assets to invest and the Departed Planners' knowledge of those clients." This is <u>not</u> a written compilation of client information or data that the Departed Planners took when they resigned. This is <u>not</u> a recreated "master list" that the Departed Planner memorized before resigning. Indeed, there is <u>no</u> <u>evidence</u> that Edelman has a "master list" at all. The only evidence before the Court is that each Departed Planner (except for one) recreated from memory an incomplete and disparate list of clients he had serviced with Edelman. Edelman has not shown that each list included every client of each planner; it appears that each individual list was a partial client list. The initial lists were <u>only names</u>. That is the extent of the content.

The Departed Planners then researched through public sources to find contact information. In some instances, their independent memory of a client's location or other personal information they obtained via a personal relationship with the client may have helped. But the list itself had no other information. There is no evidence that the Departed Planners intentionally memorized their lists or took other action before leaving Edelman that would give them an advantage over someone else trying to locate contact information. And the fact that the clients had confirmed assets to invest makes this list no different from any other client or customer list; a client or customer by its very nature is assumed to have both an interest in the product or service and the ability to pay for it.

### b.    Non-Public Fee and AUM Information.

The second alleged trade secret is more difficult to define: "non-public information regarding specific Edelman fees and AUM of the clients serviced by the Departed Planners." It is unclear to the Court where Edelman is drawing the line between public and non-public information. Clients know (or could readily ascertain) the fees they are charged, and they know their own AUM. This is information they are capable of giving another financial planner at any time. There is no evidence that Edelman's clients were prohibited from sharing information about the services Edelman provided them, the types of accounts and balances serviced, and the fees they incurred. And Edelman has not produced evidence that the Departed Planners gave Mariner specific information about fees charged a particular client (by name) or the AUM that any particular client had (by name). The contours of this alleged trade secret are murky.

### 2.    Reasonable Measures to Maintain Secrecy.

With these contours of the two alleged trade secrets in mind, the Court considers whether each constitutes a trade secret under the law. The Court first looks at whether Edelman took reasonable measures to maintain the secrecy of its client lists and its non-public AUM and fee information. What qualifies as "reasonable" is fact-dependent. *Snyder*, 147 F.4th at 1256. But reasonableness requires more diligence than "normal business precautions." *Id.* (citation omitted). An entity's property right is extinguished if it discloses its trade secret to individuals who are not obligated to protect its confidentiality. *Id.* (citation omitted). An entity that fails to take measures to prevent sharing of a purported trade secret risks losing protection. *Id.*

There are a few problems with Edelman's efforts that apply to both categories of information. First, Edelman has produced evidence that it requires its <u>financial planners</u> to sign restrictive covenants or confidentiality agreements. But this leaves a group of other employees

14

with the same access unconstrained. Edelman has not produced evidence that customer service associates ("CSAs") are subject to the same types of agreements despite access to the same information. Mariner's attorney asked Clark, "Does Edelman enter into agreements with CSAs that have restrictive covenants?" Clark answered that he did not know. Mariner stated this as an undisputed fact, and Edelman responded, "Disputed to the extent this factual allegation is meant to suggest that any of the restrictive covenants at issue are unenforceable." Doc. 135 at ¶ 75. Edelman did not cite any evidence in support. Mariner also argued in its summary-judgment motion that Edelman failed to show that it restricted CSAs' use of client information after leaving Edelman. Edelman did not address it. Edelman does try to point to nonspecific information, but none of it establishes that CSAs had confidentiality agreements or restrictions. Edelman has come forward with no evidence that CSAs were contractually obligated to protect the confidentiality of Edelman's alleged trade secrets. *See Snyder*, 147 F.4th at 1256 (finding failure to take reasonable measures when the individual claiming ownership of the alleged trade secret did not require those with access to sign confidentiality agreements).

The second way Edelman has failed to show that it protects its confidential information is its frequent failure to pursue legal remedies. Edelman's damages expert stated that there were "additional planners who have departed" Edelman and breached their agreements. The record shows that about 74 other planners have left employment and breached their agreements with Edelman beyond those considered by Edelman's expert. Edelman took legal action against 42 of those planners. Even in this case, Edelman did not seek injunctive relief against eight of the Departed Planners. This selective enforcement of Edelman's alleged trade-secret rights shows a lack of reasonable protective measures. It also suggests that the information at issue does not constitute a trade secret at all. *See Alamar Biosciences, Inc. v. Difco Lab'ys, Inc.*, 1995 WL 912345,

at *6 (E.D. Cal. 1995) (granting summary judgment on trade secret claim under California law because the plaintiff's "failure to bring suit" established that the plaintiff "did not take reasonable steps to protect its trade secrets").

There is also further evidence that Edelman specifically failed to protect what it calls its "non-public information about AUM and fees." Edelman contends this confidential information was contained in the two BRAC reports of Garvey and Geilfuss and in an email from Varian. But none of these documents connect or disclose fees or compensation associated with specific clients. And Edelman does not dispute that its planners can generally disclose their compensation to a potential new employer. *See also Progressive Prods., Inc. v. Swartz*, 258 P.3d 969, 978 (Kan. 2011) (determining under Kansas law that price lists were not trade secrets because customers had access and could freely communicate how much they were paying). Edelman has also publicly disclosed some AUM information in various court cases. And some Edelman advisors have disclosed AUM and numerical client information on their LinkedIn profiles without apparent policing or objection by Edelman.

Edelman emphasizes its efforts to restrict internal access to client information.[10] Clark testified that Edelman does not let planners download information from the system. Specifically, Edelman does not let planners download the information in its BRACS system or its Salesforce system, where Edelman keeps all of its client information. And each planner can only see the information of his or her own clients in Salesforce.

---

[10]  Edelman cites testimony of Robert Blakley about security protocol, but Blakley's testimony is related to protecting the data of Edelman's financial systems including "general ledger, accounts payable, accounts receivable, collection, bank accounts, and compensation systems." Doc. 120-2 at 279. For these systems, Blakley testified that Edelman uses multifactor authentication, password, and encryption to maintain security and ensure confidentiality. *Id.* at 279-81. But Edelman cites these protective measures as applying to client information and AUM. Edelman's representation of Blakley's testimony is inaccurate.

Edelman's effort falls short. Edelman again does not address the access of CSAs to the same information as the planners. And Edelman makes no effort to show how these measures are any more than "normal business precautions." *See Snyder*, 147 F.4th at 1256. No reasonable jury could find that Edelman took reasonable measures to maintain the secrecy of its client lists and its non-public AUM and fee information.

### 3.    Independent Economic Value.

The next problem is that Edelman has not marshaled evidence from which a reasonable jury could find that its alleged trade secrets have independent economic value. First, the partial client lists were simply that: a partial list of clients compiled from memory. The lists did not include client preferences, investment positions, or other identifying information that might give the list more value. *See, e.g.*, *All W. Pet Supply Co. v. Hill's Pet Prods. Div., Colgate-Palmolive Co.*, 840 F. Supp. 1433, 1438 (D. Kan. 1993) (client list included purchase patterns, sales volumes, and payment histories). Independent economic value exists where (1) secrecy provides a "competitive advantage or economic benefit to the information's owner," and (2) a plaintiff shows the "time, effort, or expense" required to create a list or model. *See Double Eagle Alloys, Inc.*, 134 F.4th at 1093-94 (noting that the plaintiff failed to provide information about the time, effort, or expense involved in creating a pricing model); *Dodson Int'l Parts, Inc. v. Altendorf*, 347 F. Supp. 2d 997, 1011 (D. Kan. 2004). They were partial lists of people with whom the Departed Planners had worked.

Edelman tries to paint the content of the partial client lists as much more than that. But there is no evidence that would support the conclusion that a discrete and partial collection of a Departed Planner's client's names had independent economic value. The only evidence Edelman has in support is testimony that a few Departed Planners used their knowledge about certain

Edelman clients to track down contact information from public sources when it otherwise might have been more difficult.[11] But Edelman has not cited any authority suggesting that a bare and partial list of names becomes a trade secret under these circumstances. *Compare EIS Ultimate Holding, LP v. Huset*, 2024 WL 4472008, at *13-14 (D. Colo. 2024) (finding that the plaintiff adequately identified its customer lists as trade secrets when the lists included the "clients or potential clients, contact persons at those firms, and contact information (e.g., phone numbers and email addresses) for those contact persons," along with additional confidential information in some instances) *with AssuredPartners of Arizona LLC v. Barrios*, 2026 WL 482385, at *4-5 (D. Ariz. 2026) (distinguishing client contact information on a former employee's cell phone from a client-list-plus-more).

Likewise, Edelman's budget for advertising and its call center is not the proper measurement for the economic value of the partial client lists. The summary document Edelman submitted appears to be a five-year marketing budget for the years 2020 through 2024. Doc. 119-2 at 47-48. It is unauthenticated, does not have a date of creation or creator noted, does not demonstrate actual spent dollars, and does not connect dollars to client names or financial planners. It does not demonstrate the expense, time, or difficulty of obtaining its client names, specifically, much less the expense, time, or difficulty of obtaining a single client's name or a small subset of those names. And it does not reflect expense for client development pre-2020. Of the ten Departed Planners, six of them began employment with Edelman well before 2020 (ranging from 2012 through 2017). Clark testified that Edelman spends close to $40 million per year generating leads for its planners. Doc. 120-2 at 254. But this testimony appears to reflect what Edelman spent at the

---

[11] This is <u>not</u> a case where the Departed Planners had or, perhaps more importantly, gave <u>Mariner</u> additional information about the names they remembered. It is <u>Mariner</u> that Edelman seeks to hold responsible. Any information <u>Mariner</u> eventually obtained about Edelman's former clients came only as a result of the clients voluntarily giving it to Mariner.

time of Clark's deposition. It does not necessarily represent historical practice or what Edelman spent for the leads on the particular clients whose names appear on the lists the Departed Planners created. Edelman's evidence does not demonstrate the independent economic value of these lists.

Edelman also contends that the non-public AUM and fee information have independent economic value. But as the Court has already observed, there is no evidence that Mariner sought or received non-public AUM and fee information. In any event, even if the Court were to accept that Garvey and Geilfuss's BRAC reports and Varian's spreadsheet contained non-public AUM and fee information, Edelman has not shown that the information of three planners at one point in time has independent economic value. It is unclear to the Court how the information from Garvey, Geilfuss, and Varian would "confer[] some type of competitive advantage or economic value to the information's owner." *Double Eagle Alloys, Inc.*, 134 F.4th at 1093. Neither has Edelman presented any evidence of the time, effort, and cost to develop the AUM and fee information.

Edelman bears the burden to show that a trade secret exists. It has shown that it has lists and numbers that it does not want given to competitors. Edelman has offered some evidence of how it tries to protect its information. And it has offered some evidence of how valuable it believes its information is. But it has not shown anything that takes the identified information out of the realm of mere confidential information and into the realm of a federal trade secret. Edelman fails to create a triable jury question over whether it has identified trade secrets.

### B.    Misappropriation of Alleged Trade Secrets.

Edelman has not identified evidence from which a reasonable jury could find that a trade secret exists. But, even if it had, Edelman fails to show Mariner's misappropriation.

Section 1839(5)(A) defines "misappropriation," in part, as the "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by

19

improper means." 18 U.S.C. § 1839(5)(A). The focus of this analysis is not whether the planners acquired trade secrets improperly. It is on whether <u>Mariner</u> improperly acquired trade secrets. *See Allergan, Inc. v. Revance Therapeutics, Inc.*, 2024 WL 38289, at *7 (M.D. Tenn. 2024) ("[I]f a plaintiff shows that a defendant merely acquired (without also using or disclosing) the plaintiff's trade secret(s), then indeed the plaintiff must show that <u>the defendant</u> did so by 'improper means.'" (emphasis added)).

Improper means "includes theft, bribery, misrepresentation, breach or <u>inducement of a breach of a duty to maintain secrecy</u>, or espionage through electronic or other means." *Id.* § 1839(6)(A) (emphasis added). Therefore, if Mariner induced a breach of a duty of secrecy, the acquisition was by improper means. *See Nat'l City Bank, N.A. v. Prime Lending, Inc.*, 737 F. Supp. 2d 1257, 1267 (E.D. Wash. 2010) ("Nevertheless, Prime used improper means to acquire the information: it induced National City's outgoing employees to breach their agreements to maintain confidentiality.").

Edelman contends that Mariner acquired Edelman's trade secrets by improper means by incentivizing and inducing the Departed Planners to breach their confidentiality and noncompete agreements so Mariner could solicit Edelman's clients.

The problem is Edelman is collapsing its alleged trade secret with its restrictive covenants.[12] The trade secret underlying this theory is the partial client list.[13] And there is no evidence that Mariner engaged in improper acquisition or use of that trade secret. *See Snyder*, 147 F.4th at 1253. Edelman submitted no evidence that Mariner <u>directed</u> the Departed Planners to

---

[12]    Edelman highlights that Mariner offered a bonus for clients who moved their business to Mariner. But the alleged trade secret is the client list itself. And there is no evidence that Edelman induced the Departed Planners to create the list.

[13]    Edelman also claims misappropriation of its non-public fee and AUM information. But again, Edelman has not produced evidence that the Departed Planners gave Mariner any of this specific information about a particular client.

create the spreadsheets. Edelman submitted no evidence that Mariner received any client-specific information from the Departed Planners. Edelman submitted no evidence that Mariner used any client-specific information provided by anyone other than the clients themselves. The Departed Planners testified that Mariner did not require them to create the partial lists or to bring clients with them. Instead, Mariner provided a two-year compensation guaranty, regardless of any client list or whether any clients followed the Departed Planners. One Departed Planner did not even create a list (Borgatti), and another only brought his father (Geilfuss's father followed him to Mariner[14]). There is a dearth of evidence that Mariner acquired any trade secrets (assuming they existed) by improper means. Summary judgment in favor of Mariner is warranted on the DTSA claim on this alternate basis.

## IV.    REMAINING STATE-LAW CLAIMS

Mariner asks the Court to dismiss the state-law claims for lack of subject-matter jurisdiction if the Court grants summary judgment on Edelman's DTSA claim. Doc. 123 at 51. The DTSA claim is the only federal claim in the case and Edelman does not allege diversity jurisdiction. The Court grants summary judgment to Mariner on that claim, and the only claims that remain for trial are brought under state law. The only way the Court maintains jurisdiction over the state-law claims is by exercising supplemental jurisdiction over them.

A court has discretion to exercise supplemental jurisdiction over state-law claims that derive from "a common nucleus of operative fact" as a pending federal claim. *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164-65 (1997); *see also* 28 U.S.C. § 1367(a). Courts consider whether the values of judicial economy, convenience, and fairness would be served by asserting supplemental jurisdiction over the state-law claims. *Wittner v. Banner Health*, 720 F.3d 770, 781

---

[14]    This may appear to be hyperbole. It is not. The father of one of the Departed Planners followed his son to Mariner.

(10th Cir. 2013). But a district court may decline supplemental jurisdiction when the claims over which it had original jurisdiction have been dismissed. 28 U.S.C. 1367(c)(3); *see, e.g.*, *Exsum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138 (10th Cir. 2004); *Heffington v. Derby United Sch. Dist. 260*, 2011 WL 5149257, at *3 (D. Kan. 2011). Courts are cautious about exercising supplemental jurisdiction over state-law claims. Notions of comity and federalism weigh in favor of state courts trying their own lawsuits. *Villalpando ex rel. Villalpando v. Denver Health & Hosp. Auth.*, 65 F. App'x 683, 688 (10th Cir. 2003) (citation omitted). Declining supplemental jurisdiction is a matter within a court's discretion. *See Nielander v. Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1172 (10th Cir. 2009).

Edelman's state-law claims arise out of the same common nucleus of operative fact as the federal claims. But beyond that fact, there is little reason to maintain jurisdiction. The remaining claims are better resolved by a state court. Kansas has a vested interest in interpreting and applying its own choice-of-law guidance and principles of liability. There are several issues that have been raised by the pending motions relating to the Departed Planners' restrictive covenants, which state's law applies to some of them, and how that impacts their enforceability. Notions of comity support allowing Kansas courts to address these matters.

Concerns of convenience and fairness also weigh in favor of dismissal. Edelman took a chance by filing in federal court based on allegations that the Court characterized as "thin" nearly two years ago. Doc. 35 at 8. Discovery is complete. A state court will only need to resolve the remaining state-law issues that have been briefed. It can then proceed directly to trial without significant delay. And Mariner has specifically asked the Court to decline supplemental jurisdiction.

The Court therefore declines supplemental jurisdiction and does not reach the merits of any state-law claims.

## V.    CONCLUSION

Edelman blurs the line between what information is confidential with some value and what information is a trade secret under the DTSA. On the surface, Edelman's theory is facially attractive and the narrative is initially appealing. But when the layers are peeled back, it becomes clear that Edelman has no evidence that Mariner misappropriated a trade secret. Edelman asserts federal trade-secret protection for something that does not exist on its own. And Edelman's position is the quintessential slippery slope; it potentially federalizes every case involving restrictive covenants and would render such covenants unnecessary because federal trade secret law (with its three-year statute of limitations and enhanced penalties) would apply any time a former employee remembered a client name (even if the name was a friend, a father, or another blood relative) and made contact. *See McKesson Med.-Surgical Inc. v. Micro Bio-Medics, Inc.*, 266 F. Supp. 2d 590, 597 (E.D. Mich. 2003) ("To hold otherwise, would subject every former employee who elects to call on customers he previously called upon with the former employer to a lawsuit for 'trade secret' violation because it is likely, in all those situations that, the former employee would be aware of the needs of these customers which he/she learned about during employment with the previous employer."); 18 U.S.C. § 1836(d) (DTSA statute of limitations). Congress did not paint the DTSA with such broad strokes.

THE COURT THEREFORE ORDERS that Mariner's motion for summary judgment (Doc. 122) is GRANTED. The Court grants judgment in Mariner's favor on Edelman's federal trade secrets infringement claim. Edelman's remaining state-law claims are DISMISSED WITHOUT PREJUDICE for lack of subject-matter jurisdiction.

THE COURT FURTHER ORDERS that Edelman's motion for partial summary judgment (Docs. 119, 120) is DENIED.

THE COURT FURTHER ORDERS that the pending *Daubert* motions (Docs. 113, 114, and 115) are denied without prejudice as moot. The Court will address the various pending motions to seal by separate order.

The case is closed.

IT IS SO ORDERED.

Dated: June 5, 2026                    /s/ *Holly L. Teeter*
                                       HOLLY L. TEETER
                                       UNITED STATES DISTRICT JUDGE